IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| M & M MARKETING, L.L.C. and ) | |
| PREMIER FIGHTER, L.L.C., ) | |
| ) | CASE NO. BK09-81458-TJM |
| Debtor(s). ) | A11-8096-TJM |
| MICHAEL BLUMENTHAL, ) | |
| ) | |
| Plaintiff, ) | CHAPTER 7 (involuntary) |
| ) | |
| RICHARD D. MYERS, Chapter 7 Bankruptcy ) | |
| Trustee of M & M Marketing, L.L.C. and ) | |
| Premier Fighter, L.L.C., ) | |
| ) | |
| Intervenor-Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| JERRY CRONK; CHERYL CRONK; ) | |
| JEROME LANGDON; COLEEN ) | |
| LANGDON; PHILLIP CRONK; LORRAINE ) | |
| CRONK; RONALD CRONK; RYAN CRONK; ) | |
| and HEATHER ANSELMO, ) | |
| ) | |
| Defendants. ) | |

ORDER

This matter is before the court on the Cronk and Langdon defendants' motion for summary judgment (Fil. No. 40). W. Patrick Betterman and Lindsay E. Pedersen represent the bankruptcy trustee, and Richard A. DeWitt, Robert M. Gonderinger, and David J. Skalka represent the Cronk and Langdon defendants. Evidence and briefs were filed and, pursuant to the court's authority under Nebraska Rule of Bankruptcy Procedure 7056-1, the motion was taken under advisement without oral arguments.

With regard to the dispute over the admissibility of the deposition of Matthew Anselmo, the deposition excerpts were not considered in the deliberations on this motion, pursuant to the order entered December 10, 2012, granting the defendants' motion to strike.

The motion for summary judgment is granted in part and denied in part.

In 2007, the defendants, who were all related by marriage to Matthew Anselmo, the debtors' controlling person, loaned more than $2 million to the debtors. In 2007 and 2008, the debtors transferred more than $2 million to the defendants, allegedly with the intent to hinder, delay, and defraud creditors as part of a Ponzi scheme.[1] The trustee alleges claims of fraudulent transfer under the Uniform Fraudulent Transfer Act ("UFTA"), unjust enrichment, and assumpsit for money had and received against each of the defendants, and seeks the avoidance of the transfers and the imposition of constructive trusts on the proceeds. The Cronk and Langdon defendants have moved for summary judgment on all counts.

I. Summary Judgment Standard

Summary judgment is appropriate only if the record, when viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). On a motion for summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 2677 (2009) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id. (quoting Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

II. Facts

The parties agree on the following facts:

1. Involuntary Chapter 7 petitions for relief were filed against M & M Marketing, L.L.C., and Premier Fighter, L.L.C., by several of the defendants on June 3, 2009.

2. This court has jurisdiction of this adversary proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A, F and H) and Rule 7001(2) of the Federal Rules of Bankruptcy Procedure.

---

[1] A Ponzi scheme is an investment cozenage premised on people's gullibility and greed.

A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." Donell v. Kowell, 533 F.3d 762, 767 n.2 (9th Cir. 2008) (quoting In re United Energy Corp., 944 F.2d 589, 590 n.1 (9th Cir. 1991)).

3. This matter is a core proceeding under 28 U.S.C. § 157(b)(2) (A, F, H and O), over which the court has jurisdiction pursuant to 28 U.S.C. §§1334(b), 157(a), and 157(b)(1).

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1409 and 28 U.S.C. § 1391.

5. Defendants Jerry Cronk, Cheryl Cronk, Coleen Langdon, Jerome Langdon, Ryan Cronk and Heather Anselmo currently reside and resided at the time the transfers were made in Nebraska.

6. Defendants Phillip Cronk and Lorraine Cronk currently reside and resided at the time the transfers were made in Colorado.

7. Defendant Ronald Cronk currently resides and resided at the time the transfers were made in Arizona.

8. Debtor M & M Marketing, L.L.C., is a Nebraska limited liability company and in 2007 and 2008 was engaged in the marketing and sale of marketing goods, golf-related products, and materials, with its principal place of business in Nebraska.

9. Debtor Premier Fighter, L.L.C., is a Nebraska limited liability company that is a wholly owned subsidiary of M & M and in late 2007 and 2008 was engaged in the marketing and sale of mixed martial arts goods and events.

10. The defendants transferred the following amounts to M & M on the dates indicated:

| Date | Transferor | Amount |
| --- | --- | --- |
| 3/5/2007 | Jerry and Cheryl Cronk | $ 98,000.00 |
| 3/8/2007 | Jerry and Cheryl Cronk | $ 102,000.00 |
| 6/5/2007 | Jerry and Cheryl Cronk | $ 227,000.00 |
| 7/9/2007 | Jerry and Cheryl Cronk | $ 19,000.00 |
| 2/26/2008 | Jerry and Cheryl Cronk | $ 295,000.00 |
| 3/ ? /2007 | Phil and Lorraine Cronk | $ 222,000.00 |
| 6/6/2007 | Phil and Lorraine Cronk | $ 250,000.00 |
| 7/13/2007 | Phil and Lorraine Cronk | $ 320,000.00 |
| 3/7/2007 | Ron Cronk | $ 200,000.00 |
| 6/22/2007 | Ron Cronk | $ 225,000.00 |

| 2/27/2007  | Coleen and Jerome Langdon | $  75,000.00 |
| 3/1/2007   | Coleen and Jerome Langdon | $  70,000.00 |
| 3/5/2007   | Coleen and Jerome Langdon | $  50,000.00 |
| 11/14/2007 | Coleen and Jerome Langdon | $ 350,000.00 |
| 11/14/2007 | Coleen and Jerome Langdon | $  75,000.00 |
| 11/20/2007 | Coleen and Jerome Langdon | $  75,000.00 |

11. The transfers in the previous paragraph were loans made by the defendants to M & M, the terms of which required payment in full within 90 days of the loan being made.

12. The loans, other than a promissory note executed on March 6, 2007, to the Langdons for $370,000, were based on oral agreements.

13. M&M transferred the following amounts to the following defendants on the dates indicated:

| Date     | Recipient                  | Amount         |
|----------|----------------------------|----------------|
| 5/15/07  | Jerry and Cheryl Cronk     | $ 250,000.00   |
| 5/29/07  | Ron Cronk                  | $ 250,000.00   |
| 5/30/07  | Phillip and Lorraine Cronk | $ 280,000.00   |
| 6/7/07   | Coleen and Jerome Langdon  | $ 469,995.00   |
| 11/28/07 | Phil and Lorraine Cronk    | $  70,000.00   |
| 11/30/07 | Ron Cronk                  | $  50,000.00   |
| 4/04/08  | Coleen and Jerome Langdon  | $ 175,000.00   |
| 4/28/08  | Coleen and Jerome Langdon  | $  17,500.00   |

14. The transfers in the previous paragraph were payments on contractual debts M & M owed to said defendants, those contractual debts being loans the defendants previously made to M & M, that were due or delinquent at the time each transfer was made.

15. Premier transferred the following amounts to the following defendants on the dates indicated:

| Date | Recipient | Amount |
|---|---|---|
| 4/14/08 | Phil and Lorraine Cronk | $ 40,000.00 |
| 4/14/08 | Ron Cronk | $ 50,000.00 |
| 4/24/08 | Phil and Lorraine Cronk | $ 50,000.00 |

16. The transfers in the previous paragraph were payments on contractual debts M & M owed to said defendants, those contractual debts being loans the defendants previously made to M & M, that were due or delinquent at the time each transfer was made. Defendants Phil and Lorraine Cronk and Ron Cronk believed these payments came from M & M and applied those amounts to debts M & M owed them.

17. The defendants transferred the following amounts to Premier on the dates indicated:

| Date | Transferor | Amount |
|---|---|---|
| 5/6/2008 | Coleen and Jerome Langdon | $ 20,000.00 |
| 5/15/2008 | Coleen and Jerome Langdon | $ 100,000.00 |

18. The transfers in the previous paragraph were loans made by the defendants to Premier. Premier made no payments on these loans.

19. On or about May 21, 2007, M & M caused a transfer of funds totaling at least $302,077.00, which were used in part to purchase a house located at 415 Martin Drive, Bellevue, Nebraska. The property was titled in the names of Matthew Anselmo and Heather Anselmo.

III. Discussion

The trustee alleges a number of state law causes of action to recover the transfers.

A.   Assumpsit

An action in assumpsit for money had and received may be brought where a party has received money which in equity and good conscience should be repaid to another. In such a circumstance, the law implies a promise on the part of the person who received the money to reimburse the payor in order to prevent unjust enrichment. In order to maintain an action for money had and received, a plaintiff must show that (1) the defendant received money, (2) the defendant retained possession of the money, and (3) the defendant in justice and fairness ought to pay the money to the plaintiff.

Schellpeper v. Mastny (In re Margaret Mastny Revocable Trust), 794 N.W.2d 700, 711-12 (Neb.

-5-

2011) (internal citations omitted).

The defendants argue that the trustee cannot establish the elements of this claim because the payments the defendants received did not repay the principal amounts loaned to the debtors, so there could be no unjust enrichment, and because the transactions were governed by contractual agreements.

B.   Unjust Enrichment

The elements of unjust enrichment are the same as for assumpsit. "To recover under a theory of unjust enrichment, the plaintiff must allege facts that the law of restitution would recognize as unjust enrichment[, which is the] transfer of a benefit without adequate legal ground." City of Scottsbluff v. Waste Connections of Nebraska, Inc., 809 N.W.2d 725, 743 (Neb. 2011). The plaintiff must show that (1) the defendant received money, (2) the defendant retained possession of the money, and (3) the defendant in justice and fairness ought to pay the money to the plaintiff. Bel Fury Inv. Grp., L.L.C. v. Palisades Collection, L.L.C., 814 N.W.2d 394, 400 (Neb. Ct. App. 2012).

> Unjust enrichment requires restitution, see Ahrens v. Dye, 208 Neb. 129, 302 N.W.2d 682 (1981), which measures the remedy by the gain obtained by the defendant, and seeks disgorgement of that gain. See, State ex rel. Palmer v. Unisys Corp., 637 N.W.2d 142 (Iowa 2001); Burch & Cracchiolo, P.A. v. Pugliani, 144 Ariz. 281, 697 P.2d 674 (1985) (en banc). In other words, when damages are based upon unjust enrichment, a defendant is liable only to the extent of the enrichment.

Trieweiler v. Sears, 689 N.W.2d 807, 834 (Neb. 2004).

The defendants assert that the trustee cannot establish a claim for unjust enrichment because such a claim assumes the parties' dealings were not subject to contract, and because the measure of damages is restitution, which would imply that the defendants obtained a gain while they argue they did not.

C.   Constructive Trust

A constructive trust is a relationship with respect to property subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his or her acquisition or retention of the property would constitute unjust enrichment. Trieweiler v. Sears, 689 N.W.2d at 834.

> [A] party seeking to establish the trust must prove by clear and convincing evidence that the individual holding the property obtained title to it by fraud, misrepresentation, or an abuse of an influential or confidential relationship and that under the circumstances, such individual should not, according to the rules of equity and good conscience, hold and enjoy the property so obtained.

Id.

Fungible assets like money require more work in imposing a constructive trust:

> [W]here money is the asset upon which the constructive trust is based, it is necessary that the specific amounts be identified and located, either by tracing the money to a specific and existing account, or where the funds have been converted into another type of asset such as by the purchase of real property, the money must be traced into the item of property.

Id.

Here, the defendants argue that the trustee cannot prove they received payments through fraud, misrepresentation, or the abuse of an influential or confidential relationship.

    D.    *In pari delicto* doctrine

The defendants assert that the trustee's assumpsit, unjust enrichment, and constructive trust claims are barred by the equitable defense of *in pari delicto* ("in equal fault"), which is the "principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing." Grassmueck v. Am. Shorthorn Ass'n, 402 F.3d 833, 837 (8th Cir. 2005) (quoting Black's Law Dictionary 806 (8th ed. 2004)).

As the United States Supreme Court explained,

> The common-law defense at issue in this case derives from the Latin, *in pari delicto potior est conditio defendentis*: "In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." The defense is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality. In its classic formulation, the *in pari delicto* defense was narrowly limited to situations where the plaintiff truly bore at least substantially equal responsibility for his injury, because "in cases where both parties are in delicto, concurring in an illegal act, it does not always follow that they stand in pari delicto; for there may be, and often are, very different degrees in their guilt." 1 J. Story, Equity Jurisprudence 304-305 (13th ed. 1886) (Story). . . . Notwithstanding these traditional limitations, many courts have given the *in pari delicto* defense a broad application to bar actions where plaintiffs simply have been involved generally in "the same sort of wrongdoing" as defendants. Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. [134] at 138 [(1968)].

Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306-07 (1985) (footnotes omitted).

The defense can bar a claim by a bankruptcy trustee against a third party for pre-petition harm to a debtor when the debtor's agents colluded in the wrongful conduct alleged. Grassmueck, 402 F.3d at 841-42. "It would follow that the defense could also bar a claim by a bankruptcy debtor against a third party for pre-petition or post-petition harm to a debtor when the debtor himself or herself colluded in or engaged in the wrongful conduct alleged." Timmerman v. Eich, 809 F. Supp. 2d 932, 952 (N.D. Iowa 2011).

In this case, the trustee is asserting these state-law claims on behalf of the debtors. He admits that Mr. Anselmo, as the sole and managing member of the debtors, intentionally engaged in fraudulent activity. Even if the trustee could prove the elements of each of his state-law claims – which does not appear likely under the facts of this case – the alleged wrongful conduct of the defendants cannot outweigh the actual wrongful conduct of the person in control of the debtors. Summary judgment should be granted to the defendants on these state-law claims.

E.     UFTA

The Bankruptcy Code permits a trustee to bring a fraudulent transfer claim based on state law. 11 U.S.C. § 544(b).[2]

> For the application of bankruptcy to a failed Ponzi scheme, one of the means invoked for the redress of frustrated, unpaid latecomers is the panoply of avoidance remedies under fraudulent-transfer statutes, state and federal. The steward of a bankruptcy estate – a trustee under Chapter 7 or a debtor-in-possession under Chapter 11 – will sue to avoid transfers of money, property, or other value that the debtor had made to earlier investors, characterizing such transfers as fraudulent on the debtor's contemporaneous or future creditors. To justify the use of avoidance remedies, the plaintiff-trustee characterizes the transfer as actually fraudulent, constructively fraudulent, or (most commonly) both.

Stoebner v. Ritchie Capital Mgmt., L.L.C. (In re Polaroid Corp.), 472 B.R. 22, 33 (Bankr. D. Minn. 2012) (footnote omitted).

The trustee claims the transfers by the debtors were fraudulent under Neb. Rev. Stat. §§ 36-705(a)(1), 36-705(a)(2), 36-706(a) or 36-706(b).

---

[2]The language of UFTA and the Bankruptcy Code's fraudulent transfer statute at § 548 are essentially the same, so courts commonly use the same analysis under both laws. Kaler v. Red River Commodities, Inc. (In re Sun Valley Prods., Inc.), 328 B.R. 147, 155 (Bankr. D.N.D. 2005); Grochocinski v. Zeigler (In re Zeigler), 320 B.R. 362, 372 (Bankr. N.D. Ill. 2005) ("Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA.") (citing Levit v. Spatz (In re Spatz), 222 B.R. 157, 164 (N.D. Ill. 1998)).

Section 36-705(a) governs transfers fraudulent as to present and future creditors:

§ 36-705. Transfers fraudulent as to present and future creditors
 (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
  (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
  (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
   (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
   (ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Section 36-706 governs transfers that are fraudulent as to present creditors:

§ 36-706. Transfers fraudulent as to present creditors
 (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
 (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider knew or reasonably should have known that the debtor was insolvent.

Value is given when property is transferred or an antecedent debt is secured or satisfied. Neb. Rev. Stat. § 36-704(a).[3] If the sum of the debtor's debts is greater than all of the debtor's assets at

---

[3]The statute reads in full:

36-704. Value
 (a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.
 (b) For the purposes of subdivision (a)(2) of section 36-705 and section
(continued...)

a fair valuation, or if the debtor is generally not paying its debts as they become due, the debtor is insolvent. Neb. Rev. Stat. § 36-703.[4] Insolvency is generally a question of fact, J.L. Brock Builders, Inc. v. Dahlbeck, 391 N.W.2d 110, 116 (Neb. 1986), but Ponzi schemes are considered insolvent from their inception. Cunningham v. Brown, 265 U.S. 1, 7-8 (1924). Moreover, the involuntary Chapter 7 petitions in this case were filed on the basis that the debtors were generally not paying their debts as they came due.

Another relevant factor is that the transfers were made to insiders. "Insiders" include relatives of a member of a debtor if the debtor is a limited liability company. Neb. Rev. Stat. § 36-702(7)(iv)(B). A "relative" is "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree." Neb. Rev. Stat. § 36-702(11). Here, the defendants are the parents, brother, uncles and aunts of Heather Anselmo. At the time, Heather was married to Matthew Anselmo, the sole member of M & M, so the defendants are all related within the first or second degree to the debtors' member's spouse and therefore are insiders.

In an action to set aside a fraudulent transfer, the creditor or trustee bears the burden of proving, by clear and convincing evidence, that fraud existed in the questioned transaction, Comcast

---

[3](...continued)
36-706, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

    (c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

[4]The statute provides in part:

36-703. Insolvency
    (a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
    (b) A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.
    . . .
    (d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under the Uniform Fraudulent Transfer Act.
    (e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

of Illinois X v. Multi-Vision Elec., Inc., 504 F. Supp. 2d 740, 748 (D. Neb. 2007), but good faith is a defense available to the defendants. Neb. Rev. Stat. § 36-709.[5]

In their motion for summary judgment, the defendants argue they gave the debtors more than

---

[5]That statute provides:

36-709. Defenses, liability, and protection of transferee
    (a) A transfer or obligation is not voidable under subdivision (a)(1) of section 36-705 against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.
    (b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under subdivision (a)(1) of section 36-708, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:
        (1) the first transferee of the asset or the person for whose benefit the transfer was made; or
        (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.
    (c) If the judgment under subsection (b) of this section is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.
    (d) Notwithstanding voidability of a transfer or an obligation under the Uniform Fraudulent Transfer Act, a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to:
        (1) a lien on or a right to retain any interest in the asset transferred;
        (2) enforcement of any obligation incurred; or
        (3) a reduction in the amount of the liability on the judgment.
    (e) A transfer is not voidable under subdivision (a)(2) of section 36-705 or section 36-706 if the transfer results from:
        (1) termination of a lease upon default by the debtor when the termination is pursuant to the lease and applicable law; or
        (2) enforcement of a security interest in compliance with article 9, Uniform Commercial Code.
    (f) A transfer is not voidable under subsection (b) of section 36-706:
        (1) to the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien;
        (2) if made in the ordinary course of business or financial affairs of the debtor and the insider; or
        (3) if made pursuant to a good faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor.

reasonably equivalent value for the payments they received because the defendants suffered net losses on the loans. They also assert they received the payments from the debtors in good faith and are therefore entitled to keep the payments regardless of Mr. Anselmo's alleged intent to defraud creditors.

Both sides concede that Mr. Anselmo used the debtors to operate a Ponzi scheme. Transfers made in furtherance of such a scheme are presumed to have been made with intent to defraud. Perkins v. Haines, 661 F.3d 623, 626 (11th Cir. 2011); Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008). Defrauded Ponzi investors give "value" to the debtor in exchange for the return of the principal amount of their investment, but not as to any payments in excess of principal. Perkins at 627.

To determine whether transfers made in connection with Ponzi schemes are fraudulent, some courts follow a two-step process. Donell v. Kowell, 533 F.3d at 771. The first step is to apply the "netting rule" to compare the amounts transferred to the investor against the initial amounts invested by that individual. If the net is positive, then liability has been established and the court must determine the actual amount of the liability. In contrast, if the net is negative, the investor – if he acted in good faith – is not liable and the payments are not avoidable under UFTA. Id. (applying California UFTA law, which is the same in all relevant respects as the Nebraska UFTA).

The second step is to determine the actual amount of liability. "Payments up to the amount of the initial investment are considered to be exchanged for reasonably equivalent value, and thus not fraudulent, because they proportionally reduce the investors' rights to restitution." Id. at 772 (citation omitted). However, "[i]f investors receive more than they invested, payments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity." Id. (citation omitted). In this case, none of the parties received more than they put in, so this step need not be applied here.

Because the elements of insolvency and actual intent to defraud are deemed established by the nature of the transaction, the only issues to be determined are whether the defendants provided reasonably equivalent value for the transfers and whether they acted in good faith.

"'Good faith,' among other characteristics, encompasses an absence or freedom from intent to defraud. (Citations omitted.) Consequently, good faith and fraud are mutually exclusive terms; the presence of one excludes the existence of the other in the same subject." Schall v. Anderson's Impl., Inc., 484 N.W.2d 86, 90 (Neb. 1992) (quoting Gifford-Hill & Co. v. Stoller, 380 N.W.2d 625, 630 (1986)). "[C]ourts look to what the transferee objectively knew or should have known. In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1355 (8th Cir. 1995) (internal citations and quotations omitted). Likewise, good faith is absent if the circumstances "would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose." Hayes v. Palm Seedlings Partners - A (In re Agric. Research & Tech. Group, Inc.), 916 F.2d 528, 536 (9th Cir. 1990); Jobin v. McKay (In re M & L Bus. Mach. Co.), 84 F.3d 1330, 1338 (10th Cir. 1996). See also

Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC), 439 B.R. 284, 310 (S.D.N.Y. 2010) (collecting cases).

The Cronk defendants stated in affidavit testimony in support of their motion that they had no knowledge at the time they made their loans that the debtors were insolvent. When repayments were late, Mr. Anselmo would explain that the companies had temporary cash-flow issues, or delivery of inventory had been delayed, or production problems caused delays, or accounts receivable were slow to come in. The Cronks say they believed the debtors were legitimate businesses. They visited the businesses themselves and observed employees performing work for the companies. Some of them also met fighters sponsored by the debtors, and attended a fight event whose participants were sponsored by Premier Fighter. The Cronks assert they were unaware of the companies' financial problems until they learned in June 2008 of litigation in Illinois alleging fraud by Mr. Anselmo. Concurrently, Mr. Anselmo provided Jerry Cronk with a copy of a $7.9 million check to M & M purportedly from a large company. Upon examining the check, the Cronks had reason to suspect it was fraudulent.

However, despite their alleged lack of knowledge of the debtors' financial condition, the Cronks were aware that Mr. Anselmo was offering very generous repayment terms on their loans, such as a 25 percent return within 90 days. Cheryl Cronk testified in a deposition that she was aware the 25 percent interest rate was significantly higher than the interest rates on loans she had taken out. Her testimony also suggests that perhaps she knew these rates were too good to be true, because she stated she would not likely have made loans on these terms to anyone else. This comports with testimony from each of the other Cronk defendants indicating they were willing to lend such large amounts of money to Mr. Anselmo because he was family and they trusted him.

Turning a blind eye to information that suggests fraud does not insulate a transferee from the conclusion that he had knowledge and therefore was not acting in good faith. Wasserman v. Bressman (In re Bressman), 327 F.3d 229, 236 (3rd Cir. 2003) ("If a transferee possesses knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by the transferee would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels, thereby preventing a finding that he has knowledge.").

The evidence currently before the court does not support a finding as a matter of law that the Cronk defendants acted in good faith.

The next issue to be addressed is whether the debtors received reasonably equivalent value for the transfers. The defendants argue that because they suffered net losses on their loans to the debtors, they did not receive the "fictitious profits" discussed in Donell v. Kowell that would otherwise be subject to avoidance.

Courts have found that payment of principal and interest on a contractual debt can, in the right circumstances, be reasonably equivalent value:

> In this case, the Debtor paid the Defendants the agreed upon interest for use of the Defendants' money over time. The interest rates were reasonable, and there is no suggestion in the record that Defendants were anything but innocent investors. There is nothing to suggest that they were aware that the Debtor was operating a Ponzi scheme. This was not the typical "too-good-to-be-true" investment scheme. In exchange for the interest paid to the Defendants, the Debtor received a dollar-for-dollar forgiveness of a contractual debt. This satisfaction of an antecedent debt is "value[ ]" [under the Connecticut UFTA] [,] and in this case "reasonably equivalent value."

Daly v. Deptula (In re Carrozzella & Richardson), 286 B.R. 480, 491 (D. Conn. 2002).

In contrast, the present case involves a promissory note between M & M Marketing and Jerry and Colleen Langdon, dated March 6, 2007, for $370,000 to be repaid less than two months after the note was made, along with interest of 25 percent. The other defendants did not have written contracts with the debtor, but were also receiving excessively high interest rates on short-term investments or loans. The defendants received these sums, or more, on their early investments. As the early investments were repaid in full, albeit after several of the checks bounced, the defendants continued to invest/lend money until the repayments became fewer and farther between after the middle of 2007 and stopped altogether in 2008.

The terms for the use of the defendants' funds should have given anyone pause, especially because that rate of return was unreasonable for that time period. This clearly was a "too good to be true" investment scheme, whether the defendants wanted to believe that or not. The case law on "netting" offers mixed guidance on whether the net income or loss should be calculated in total or for each transfer. Nevertheless, courts are clear that only "good faith investors" are permitted to retain repayment of their investment while disgorging the profits, if any. Donell v. Kowell, 533 F.3d at 772. As noted above, the existence of good faith is a major issue of fact in this case, which precludes the entry of summary judgment.

### IV. Conclusion

As explained in detail above, summary judgment is granted in favor of the defendants as to the trustee's claims of assumpsit, unjust enrichment, and constructive trust. However, summary judgment is denied as to the movants' defenses under UFTA because the issue of good faith is a question of fact.

IT IS ORDERED: The Cronk and Langdon defendants' motion for summary judgment (Fil. No. 40) is granted in part and denied in part. The only question that remains is whether the defendants acted in good faith under UFTA in participating in these transfers. The parties should prepare and file a pretrial statement on that issue on or before March 1, 2013.

DATED:      January 15, 2013

BY THE COURT:

/s/ Timothy J. Mahoney
United States Bankruptcy Judge

Notice given by the Court to:
    *W. Patrick Betterman
    *Lindsay E. Pedersen
    Richard A. DeWitt
    Robert M. Gonderinger
    David J. Skalka
    U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.