IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| M&M MARKETING, L.L.C. and | ) |
| PREMIER FIGHTER, L.L.C., | ) |
| | )     CASE NO. BK09-81458-TJM |
| Debtor(s). | )     A11-8096-TJM |
| MICHAEL BLUMENTHAL, | ) |
| | ) |
| Plaintiff, | )     CHAPTER 7 (involuntary) |
| | ) |
| RICHARD D. MYERS, Chapter 7 Bankruptcy | ) |
| Trustee of M&M Marketing, L.L.C. and | ) |
| Premier Fighter, L.L.C., | ) |
| | ) |
| Intervenor-Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JERRY CRONK; CHERYL CRONK; | ) |
| JEROME LANGDON; and COLEEN | ) |
| LANGDON, | ) |
| Defendants. | ) |

## ORDER

Trial was held in Omaha, Nebraska, from October 29, 2013, through November 1, 2013, on the intervenor's complaint (Fil. No. 10). W. Patrick Betterman appeared for the Chapter 7 bankruptcy trustee as intervenor-plaintiff, and David J. Skalka appeared for Jerry and Cheryl Cronk and Jerome and Coleen Langdon. Post-trial briefs were submitted, and the matter is now ready for decision.

Judgment will be entered in favor of the defendants.

In 2007 and 2008, the defendants, who were all related by marriage to Matthew Anselmo, the debtors' controlling person, loaned money to the debtors. In 2007 and 2008, the debtors transferred money to the defendants, allegedly with the intent to hinder, delay, and defraud creditors as part of a Ponzi scheme. The trustee alleges claims of fraudulent transfer under the Nebraska Uniform Fraudulent Transfer Act and seeks the avoidance of the transfers.

I. Stipulated Facts

According to the second joint preliminary pretrial statement (Fil. No.104), the parties agree on the following facts:

1.Involuntary Chapter 7 petitions for relief were filed against M & M Marketing, L.L.C., and Premier Fighter, L.L.C., by several of the defendants on June 3, 2009.

2.This court has jurisdiction of this adversary proceeding under 28 U.S.C. §§ 1334 and 157(B)(2)(A, F and H) and Rule 7001(2) of the Federal Bankruptcy Rules of Procedure.

3.This matter is a core proceeding under 28 U.S.C. § 157(b)(2) (A, F, H and O), over which the court has jurisdiction pursuant to 28 U.S.C. §§1334(b), 157(a), and 157(b)(1).

4.Venue is proper in this court pursuant to 28 U.S.C. § 1409 and 28 U.S.C. § 1391.

5.Defendants Jerry Cronk, Cheryl Cronk, Coleen Langdon, and Jerome Langdon currently reside, and resided at the time the transfers were made, in Nebraska.

6.Debtor M & M Marketing, L.L.C., is a Nebraska limited liability company and in 2007 and 2008 was engaged in the marketing and sale of goods, golf-related products and materials, with its principal place of business in Nebraska.

7.Debtor Premier Fighter, L.L.C., is a Nebraska limited liability company that is a wholly owned subsidiary of M & M and in late 2007 and 2008 was engaged in the marketing and sale of mixed martial arts goods and events.

8.The defendants transferred the following amounts to M & M on the dates indicated:

| Date | Transferor | Amount |
|---|---|---|
| 3/5/2007 | Jerry and Cheryl Cronk | $ 98,000.00 |
| 3/8/2007 | Jerry and Cheryl Cronk | $ 102,000.00 |
| 6/5/2007 | Jerry and Cheryl Cronk | $ 227,000.00 |
| 7/9/2007 | Jerry and Cheryl Cronk | $ 19,000.00 |
| 2/26/2008 | Jerry and Cheryl Cronk | $ 295,000.00 |
| 2/27/2007 | Coleen and Jerome Langdon | $ 75,000.00 |
| 3/1/2007 | Coleen and Jerome Langdon | $ 70,000.00 |
| 3/5/2007 | Coleen and Jerome Langdon | $ 50,000.00 |
| 11/14/2007 | Coleen and Jerome Langdon | $ 350,000.00 |
| 11/14/2007 | Coleen and Jerome Langdon | $ 75,000.00 |
| 11/20/2007 | Coleen and Jerome Langdon | $ 75,000.00 |

9. The transfers in the previous paragraph were loans made by the defendants to M & M, the terms of which required payment in full within 90 days of the loan being made.

10. The loans, other than a promissory note executed on March 6, 2007, to the Langdons for $370,000, were based on oral agreements.

11. M & M transferred the following amounts to the following defendants on the dates indicated:

| Date | Recipient | Amount |
| --- | --- | --- |
| 5/15/07 | Jerry and Cheryl Cronk | $ 250,000.00 |
| 6/7/07 | Coleen and Jerome Langdon | $ 469,995.00 |
| 4/04/08 | Coleen and Jerome Langdon | $ 175,000.00 |
| 4/28/08 | Coleen and Jerome Langdon | $ 17,500.00 |

12. The transfers in the previous paragraph were payments on contractual debts M & M owed to said defendants, those contractual debts being loans the defendants previously made to M & M, that were due or delinquent at the time each transfer was made.

13. The defendants transferred the following amounts to Premier on the dates indicated:

| Date | Transferor | Amount |
| --- | --- | --- |
| 5/6/2008 | Coleen and Jerome Langdon | $ 20,000.00 |
| 5/15/2008 | Coleen and Jerome Langdon | $ 100,000.00 |

14. The transfers in the previous paragraph were loans made by the defendants to Premier. Premier made no payments on these loans.

II. Court's Factual Findings

1. The trustee, as intervenor in this action which was originally brought by Michael Blumenthal against the named defendants and others, filed a complaint alleging, among numerous causes of action, that the transfers by the debtors to the named defendants should be avoided for the benefit of the bankruptcy estate pursuant to the Nebraska Uniform Fraudulent Transfer Act, specifically Neb. Rev. Stat. §§ 36-705(a)(1), 36-705(a)(2), 36-706(a) or 36-706(b).

  2. The debtors were insolvent, that is, their financial condition was such that the sum of their debts was greater than all of the property at a fair valuation from the date of their legal creation through the date of the filing of the involuntary petitions.

  3. The defendants are "insiders" as that term is used in Neb. Rev. Stat. § 36-702(7)(iiii)(B) being the parents and uncle and aunt of Heather Anselmo, who at the time of the transfers was the spouse of Matthew Anselmo, the sole member of M & M.

  4. The debtors, as operated by Matthew Anselmo, were involved in a Ponzi scheme.[1]

  5. The payments were made to defendants by the debtors with Matthew Anselmo's intent to hinder, delay or defraud other creditors, including the State of Nebraska Department of Revenue, Mr. Blumenthal and Dr. Frank Vacari, two individuals who loaned the debtor more than a million dollars in May of 2007.

  6. The defendants, as insiders, did not know nor have reason to know of the insolvency of the debtors at the time of the transfers.

  7. The debtors received reasonably equivalent value for the transfers because such payments completely or partially satisfied contractual loan obligations of the debtors as to the defendants as creditors.

  8. The defendants received the payments in good faith.

### III. Conclusions of Law and Discussion

The Bankruptcy Code permits a trustee to bring a fraudulent transfer claim based on state law. 11 U.S.C. § 544(b).[2]

---

[1] A Ponzi scheme is a financial fraud that induces investment by promising extremely high, risk-free returns, usually in a short time period, from an allegedly legitimate business venture. "The fraud consists of funnelling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." Donell v. Kowell, 533 F.3d 762, 767 n.2 (9th Cir. 2008) (quoting In re United Energy Corp., 944 F.2d 589, 590 n.1 (9th Cir. 1991)).

[2] The language of UFTA and the Bankruptcy Code's fraudulent transfer statute at § 548 are essentially the same, so courts commonly use the same analysis under both laws. Kaler v. Red River Commodities, Inc. (In re Sun Valley Prods., Inc.), 328 B.R. 147, 155 (Bankr. D.N.D. 2005); Grochocinski v. Zeigler (In re Zeigler), 320 B.R. 362, 372 (Bankr. N.D. Ill. 2005) ("Because the provisions of the UFTA parallel § 548 of the Bankruptcy Code, findings made under the Bankruptcy Code are applicable to actions under the UFTA.") (citing Levit v. Spatz (In re Spatz), 222 B.R. 157,
(continued...)

For the application of bankruptcy to a failed Ponzi scheme, one of the means invoked for the redress of frustrated, unpaid latecomers is the panoply of avoidance remedies under fraudulent-transfer statutes, state and federal. The steward of a bankruptcy estate – a trustee under Chapter 7 or a debtor-in-possession under Chapter 11 – will sue to avoid transfers of money, property, or other value that the debtor had made to earlier investors, characterizing such transfers as fraudulent on the debtor's contemporaneous or future creditors. To justify the use of avoidance remedies, the plaintiff-trustee characterizes the transfer as actually fraudulent, constructively fraudulent, or (most commonly) both.

Stoebner v. Ritchie Capital Mgmt., L.L.C. (In re Polaroid Corp.), 472 B.R. 22, 33 (Bankr. D. Minn. 2012) (footnote omitted).

The trustee claims the transfers by the debtors were fraudulent under Neb. Rev. Stat. §§ 36-705(a)(1), 36-705(a)(2), 36-706(a) or 36-706(b).

Section 36-705(a) governs transfers fraudulent as to present and future creditors:

§ 36-705. Transfers fraudulent as to present and future creditors
    (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
        (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
        (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
            (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
            (ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Section 36-706 governs transfers that are fraudulent as to present creditors:

§ 36-706. Transfers fraudulent as to present creditors
    (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor

---

[2](...continued)
164 (N.D. Ill. 1998)).

was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider knew or reasonably should have known that the debtor was insolvent.

Value is given when property is transferred or an antecedent debt is secured or satisfied. Neb. Rev. Stat. § 36-704(a).[3] If the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation, or if the debtor is generally not paying its debts as they become due, the debtor is insolvent. Neb. Rev. Stat. § 36-703.[4] Insolvency is generally a question of fact, J.L. Brock Builders, Inc. v. Dahlbeck, 391 N.W.2d 110, 116 (Neb. 1986), but Ponzi schemes are considered insolvent

---

[3]The statute reads in full:

36-704. Value

(a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

(b) For the purposes of subdivision (a)(2) of section 36-705 and section 36-706, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

(c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

[4]The statute provides in part:

36-703. Insolvency

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.

. . .

(d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under the Uniform Fraudulent Transfer Act.

(e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

from their inception. <u>Cunningham v. Brown</u>, 265 U.S. 1, 7-8 (1924). Moreover, the involuntary Chapter 7 petitions in this case were filed on the basis that the debtors were generally not paying their debts as they came due.

Another relevant factor is that the transfers were made to insiders. "Insiders" include relatives of a member of a debtor if the debtor is a limited liability company. Neb. Rev. Stat. § 36-702(7)(iv)(B). A "relative" is "an individual related by consanguinity within the third degree as determined by the common law, a spouse, or an individual related to a spouse within the third degree as so determined, and includes an individual in an adoptive relationship within the third degree." Neb. Rev. Stat. § 36-702(11). Here, the defendants are the parents, brother, uncles and aunts of Heather Anselmo. At the time, Heather was married to Matthew Anselmo, the sole member of M & M, so the defendants are all related within the first or second degree to the debtors' member's spouse and therefore are insiders.

In an action to set aside a fraudulent transfer, the creditor or trustee bears the burden of proving, by clear and convincing evidence, that fraud existed in the questioned transaction, <u>Comcast of Illinois X v. Multi-Vision Elec., Inc.</u>, 504 F. Supp. 2d 740, 748 (D. Neb. 2007), but good faith is a defense available to the defendants. Neb. Rev. Stat. § 36-709.[5]

---

[5]That statute provides:

36-709. Defenses, liability, and protection of transferee

    (a) A transfer or obligation is not voidable under subdivision (a)(1) of section 36-705 against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee.

    (b) Except as otherwise provided in this section, to the extent a transfer is voidable in an action by a creditor under subdivision (a)(1) of section 36-708, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c) of this section, or the amount necessary to satisfy the creditor's claim, whichever is less. The judgment may be entered against:

        (1) the first transferee of the asset or the person for whose benefit the transfer was made; or

        (2) any subsequent transferee other than a good faith transferee who took for value or from any subsequent transferee.

    (c) If the judgment under subsection (b) of this section is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

    (d) Notwithstanding voidability of a transfer or an obligation under the Uniform Fraudulent Transfer Act, a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to:

        (1) a lien on or a right to retain any interest in the asset transferred;

        (2) enforcement of any obligation incurred; or

(continued...)

Because the elements of insolvency and actual intent to defraud are deemed established by the nature of the transaction, the only issues to be determined are whether the defendants provided reasonably equivalent value for the transfers and whether they acted in good faith.

At trial, the defendants argued that they gave the debtors more than reasonably equivalent value for the payments they received because the defendants suffered net losses on the loans. They also assert they received the payments from the debtors in good faith and are therefore entitled to keep the payments regardless of Mr. Anselmo's alleged intent to defraud creditors.

From the first payment by the debtors to the Cronks in May 2007 and to the Langdons in June 2007, the debtors used funds borrowed from others, including Mr. Blumenthal and Dr. Vicari. There is very little evidence that the debtors used funds earned in the operation of a legitimate business to pay any amounts to the Cronks or the Langdons in 2007 or 2008. Matt Anselmo testified that some company revenue as well as investor money was used for repayments. However, the debtors never had enough revenue on hand to make any of the repayments to the defendants. Clearly, the payments came from the operation of a Ponzi scheme.

Transfers made in furtherance of such a scheme are presumed to have been made with intent to defraud. Perkins v. Haines, 661 F.3d 623, 626 (11th Cir. 2011); Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008). Defrauded Ponzi investors give "value" to the debtor in exchange for the return of the principal amount of their investment. Perkins at 627.

To determine whether transfers made in connection with Ponzi schemes are fraudulent, courts follow the Net Investment Method, which is a two-step process. Donell v. Kowell, 533 F.3d at 771. The first step is to apply the "netting rule" to compare the amounts transferred to the investor against the amounts invested by that individual. If the net is positive, then liability has been established and

---

[5](...continued)
        (3) a reduction in the amount of the liability on the judgment.
     (e) A transfer is not voidable under subdivision (a)(2) of section 36-705 or section 36-706 if the transfer results from:
        (1) termination of a lease upon default by the debtor when the termination is pursuant to the lease and applicable law; or
        (2) enforcement of a security interest in compliance with article 9, Uniform Commercial Code.
     (f) A transfer is not voidable under subsection (b) of section 36-706:
        (1) to the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien;
        (2) if made in the ordinary course of business or financial affairs of the debtor and the insider; or
        (3) if made pursuant to a good faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor.

the court must determine the actual amount of the liability. In contrast, if the net is negative, the investor – if he acted in good faith – is not liable and the payments are not avoidable under UFTA. Id. (applying California UFTA law, which is the same in all relevant respects as the Nebraska UFTA). This netting rule has been used recently in at least two of the Madoff Ponzi scheme cases. See Securities Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec, LLC (In re Madoff Sec.), 476 B.R. 715, 729 (S.D.N.Y. 2012); Security Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC (In re Madoff Sec.), 499 B.R. 416, 426-28 (S.D.N.Y. 2013). See, e.g., Sender v. Buchanan (In re Hedged-Inv. Assocs., Inc.), 84 F.3d 1286, 1289 (10th Cir. 1996).

The second step is to determine the actual amount of liability. "Payments up to the amount of the initial investment are considered to be exchanged for reasonably equivalent value, and thus not fraudulent, because they proportionally reduce the investors' rights to restitution." Donell at 772 (citation omitted). However, "[i]f investors receive more than they invested, payments in excess of amounts invested are considered fictitious profits because they do not represent a return on legitimate investment activity." Id. (citation omitted). In this case, transfers from the debtors to the Cronks and to the Langdons, when netted against the transfers to the debtors, show a negative net for both families so, if the defendants acted in good faith, they have no liability.

"'Good faith,' among other characteristics, encompasses an absence or freedom from intent to defraud. (Citations omitted.) Consequently, good faith and fraud are mutually exclusive terms; the presence of one excludes the existence of the other in the same subject." Schall v. Anderson's Impl., Inc., 484 N.W.2d 86, 90 (Neb. 1992) (quoting Gifford-Hill & Co. v. Stoller, 380 N.W.2d 625, 630 (1986)). "[C]ourts look to what the transferee objectively knew or should have known. In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." Brown v. Third Nat'l Bank (In re Sherman), 67 F.3d 1348, 1355 (8th Cir. 1995) (internal citations and quotations omitted). Likewise, good faith is absent if the circumstances "would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose." Hayes v. Palm Seedlings Partners - A (In re Agric. Research & Tech. Group, Inc.), 916 F.2d 528, 536 (9th Cir. 1990); Jobin v. McKay (In re M & L Bus. Mach. Co.), 84 F.3d 1330, 1338 (10th Cir. 1996). See also Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC), 439 B.R. 284, 310 (S.D.N.Y. 2010) (collecting cases).

In the order on the motion for summary judgment (Fil. No. 65), the court, at page 9, reacted with some skepticism concerning the defendants' claim, in affidavit form, of acting in good faith and their claim of providing reasonably equivalent value. However, having the opportunity to see each of the defendants as they testified at trial, and listen to their reasons for believing that Anselmo's explanations for the need for funds, the tardiness of certain repayments, and the reason he could provide them with a higher return on their loans within a relatively short period of time, the skepticism no longer applies.

The defendants had known Matt Anselmo for years, since before he married Heather, the daughter of the Cronks and the niece of the Langdons. They knew he had a business setting up golf

outings and selling golf clubs and other golf-related materials. He had donated an expensive set of golf clubs for a charitable event participated in by Mrs. Langdon. He promised repayment and a twenty-five percent return on each loan within ninety days. He could use the loan to buy T-shirts pursuant to contracts that he claimed he had and make a significant return of fifty to one hundred percent on the deal. Mr. Cronk and Mr. Langdon had experience with the purchase and sale of T-shirts for school athletic fund raisers and knew of the generally high returns from such sales. The explanations he gave when the repayments were somewhat later than he had promised made sense to them. When one check bounced, he had an immediate and logical explanation. They trusted him as family. He was sharing his good fortune with them. When the repayments were late, he voluntarily increased the return he had promised to them which, from their point of view, was showing he was acting in good faith.

No evidence supports the trustee's contention that the defendants knew or should have known Matthew Anselmo was committing fraud. There was no reason for them to question his statements or his actions. When he got involved in Premier Fighter, he showed them inventory; they saw the Premier Fighter clothing at two athletic clothing stores in other cities; they watched one or more mixed martial arts fights on TV that used Premier Fighter clothing in advertising and marketing the fights.

They did not know non-relatives were also loaning money to Matt or the debtors.

The Cronks knew a lawyer who became an employee of the debtors and was involved in selling the debtors' inventory on the Internet. On occasion, the lawyer would tell Mr. Cronk that everything was going fine at the business. The lawyer had no reason to question the integrity of the business, until it fell apart after the bankruptcy was filed. He had also loaned money on the same terms as the defendants and did not believe the return was too good to be true.

At trial, another businessman who loaned money to the debtors, was involved in selling clothing with logos, and ran a shop in the same area as the debtors' facility, did not question the legitimacy of the businesses when he got involved. He was not a relative and knew less about Matt Anselmo than the defendants but trusted him enough to lend the debtors $240,000.00, which he lost because of the fraud.

Although the trustee strongly suggests everyone involved was greedy and should have known the promised returns were too good to be true, he presented no evidence to support his position except a reference to bank lending interest rates, which represented a completely different type of business loan from what was involved here.

The above analysis also applies to the "reasonably equivalent value" issue. In the order on summary judgment, at page 10, it was stated that the defendants received "excessively high interest rates." Such language was unfortunate because it assumed facts prior to any evidence having been presented concerning the rate of return. If the transactions between Matt Anselmo and defendants had been the type of loan a commercial bank makes, the rate of return received by the defendants

could be considered excessive. However, these were loans to a relative based on the relative's known honesty, with what appeared to be real contracts which would turn around funds in a short period. The family member, Matt Anselmo, was sharing the wealth generated by his business, as far as they could tell. The debtor's transfer to defendants paid back contractual loan amounts. Because Anselmo was a family member and paid back each loan almost as timely as he had promised, the defendants continued to loan him money, to their regret.

### IV.  Conclusion

The defendants received from the insolvent debtors less than they loaned the debtors, on a netting basis. They acted in good faith and gave reasonably equivalent value for the transfers. The transfers received by the defendants are not avoidable as fraudulent either under an actual fraud theory or a constructive fraud theory. A separate judgment will be entered in favor of the defendants and against the plaintiff.

IT IS ORDERED: The transfers to the defendants are not avoidable. Separate judgment will be entered.

DATED:      January 6, 2014

BY THE COURT:

/s/ Timothy J. Mahoney
United States Bankruptcy Judge

Notice given by the Court to:
  *W. Patrick Betterman
  Lindsay E. Pedersen
  Richard A. DeWitt
  Robert M. Gonderinger
  David J. Skalka
  U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.